# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

THE BRENNAN CENTER FOR JUSTICE
AT NEW YORK UNIVERSITY SCHOOL
OF LAW and CHARLES KURZMAN,

       *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE,

       *Defendant*.

Civil Action No. 18-1860 (RDM)

---

## <u>MEMORANDUM OPINION</u>

The Department of Justice ("the Department") maintains a database that contains information about cases involving the 94 U.S. Attorney's Offices brought in federal courts, including cases categorized as "terrorism" cases. Dkt. 13-1 at 3–4 (Kornmeier Decl. ¶ 11); Dkt. 13-2 at 2 (Def.'s SUMF ¶ 7). The database distinguishes between types of terrorism cases—*i.e.*, international terrorism, domestic terrorism, hoaxes, terrorist financing, export enforcement, and critical infrastructure protection—and it collects an array of other information, including the district court docket number for each case. Dkt. 13-1 at 2 (Kornmeier Decl. ¶ 4). The Department publishes much of this information online, although the online version of the database redacts the docket numbers. *Id.* at 3 (Kornmeier Decl. ¶ 6). In January 2018, Plaintiffs—the Brennan Center for Justice and Professor Charles Kurzman—sent a Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, request to the Department's Executive Office for United States Attorneys ("EOUSA"), seeking all records in the database relating to public terrorism cases, including the docket numbers. Dkt. 1-1 at 4. The Department responded but

withheld the docket numbers for each case pursuant to FOIA Exemptions 6 and 7(C), Dkt. 13-1 at 5 (Kornmeier Decl. ¶ 21), both of which, with slight variations, protect against unwarranted invasions of personal privacy, *see* 5 U.S.C. § 552(b)(6), (b)(7)(C). Plaintiffs, in turn, brought this action challenging those withholdings.

The question whether the Department's decision to withhold the docket numbers comports with FOIA is now before the Court on the parties' cross-motions for summary judgment. Dkt. 13; Dkt. 16. As the Department observes, the "Court only needs to [decide] whether Exemption 7(C) was properly invoked because it is more protective than Exemption 6 and establishes a lower bar for withholding." Dkt. 13 at 7. To resolve that question, the Court must determine, among other things, whether disclosure of the docket numbers "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). That is, the Court must balance the public interest in disclosure against the privacy interests at stake. Drawing on two D.C. Circuit precedents—*American Civil Liberties Union v. U.S. Dep't of Justice*, 655 F.3d 1 (D.C. Cir. 2011) ("*ACLU I*"), and *American Civil Liberties Union v. U.S. Dep't of Justice*, 750 F.3d 927 (D.C. Cir. 2014) ("*ACLU II*")—the Court concludes that the balance tips in different directions depending on whether the docket numbers at issue relate to cases that resulted in convictions or to cases that resulted in acquittals or that were dismissed. In both circumstances, the public interest in disclosure is substantial. The weight of the criminal defendants' privacy interests, however, differs. In cases that resulted in convictions, the defendants' privacy interests are "not . . . much more" than *de minimis*. *ACLU I*, 655 F.3d at 12. In cases that resulted in acquittals or that were dismissed, in contrast, the defendants "have a much stronger privacy interest." *ACLU II*, 750 F.3d at 933. Although balancing tests are inherently fact dependent, this difference is dispositive here.

The Court, accordingly, will **GRANT** summary judgment in favor of Plaintiffs with respect to the docket numbers for cases that resulted in convictions, and will **GRANT** summary judgment in favor of the Department with respect to the docket numbers for cases that that resulted in acquittals or were dismissed.

## I. BACKGROUND

The Department uses the Legal Information Office Network System ("LIONS") database to categorize and to track information about cases in which the 94 U.S. Attorney's Offices are involved. *See* Dkt. 13-2 at 2 (Def.'s SUMF ¶ 7); *see also* Dkt. 25-1 at 2–3 (2d Kornmeier Decl. ¶¶ 6–7). As relevant here, when a federal prosecutor opens an investigation, she creates a record of the investigation in the database, reflecting the name of the individual under investigation, the nature of the possible offense, the relevant judicial district, the name of investigator, and the agencies participating in the investigation. Dkt. 25-1 at 2 (2d Kornmeier Decl. ¶ 6). When the United States brings charges, the prosecutor adds that information to the database, along with other information, including the docket number and, eventually, the disposition of the case. *Id.*; Dkt. 13-2 at 3 (Def.'s SUMF ¶¶ 7, 11). As relevant here, the Department uses six categories to track "terrorism" prosecutions: "International Terrorism Incidents Which Impact U.S.," "Domestic Terrorism," "Terrorism Related Hoaxes," "Terrorist Financing," "Export Enforcement Terrorism-Related," and "Critical Infrastructure Protection." *See* Dkt 13-2 at 1-2 (Def.'s SUMF ¶ 2).

The Department provides online access to its "entire case management database for all 94 United States Attorney's Offices" around the country, which "contains millions of cases with hundreds of data points on each case." Dkt. 13-1 at 3–4 (Kornmeier Decl. ¶ 11). "In order to protect individual privacy," however, the Department has "redacted personally identifying

information in the database," *id.* at 4 (Kornmeier Decl. ¶ 12), including the docket numbers, Dkt.

13-2 at 3 (Def.'s SUMF ¶ 12), which can be used to derive the identity of the criminal defendant

from the courts' public dockets, *see ACLU I*, 655 F.3d at 8.

On January 17, 2018, Plaintiffs sent a FOIA request to EOUSA, which is the office

within the Department that provides administrative support to each of the U.S. Attorney's

Offices, requesting "[a]ll records in the [LIONS] database involving public charges that are

marked with at least one of" the six categories used to track "terrorism" cases. Dkt. 1-1 at 4.

Plaintiffs' FOIA request further explained that they "specifically" seek data from certain

"field[s]" in the database, including the "Court Number"—or docket number—field. *Id.*

Plaintiffs want the docket numbers to understand and to analyze how the Department

characterizes conduct as "terrorism" and how it prosecutes "terrorism" cases. Dkt. 1-1 at 3. The

Department, however, denied Plaintiffs' request for the docket numbers, asserting that they are

exempt from disclosure under FOIA Exemptions 6 and 7(C). Dkt. 1-1 at 26. On the

Department's view, releasing the docket numbers would constitute an "'unwarranted' invasion of

privacy" because this information could draw renewed attention to the individuals who were

prosecuted, thereby creating the risk of harassment, embarrassment, or impairment of their

reintegration process. *See* Dkt. 13 at 7–16.

Following the Department's denial, Plaintiffs initiated a series of timely appeals and,

after exhausting their administrative remedies, *see* Dkt. 1-1 at 15–21, 25–27, filed this FOIA

action to challenge the Department's withholding of the docket numbers, Dkt. 1. The parties'

cross-motions for summary judgment are now before the Court. Dkt. 13; Dkt. 16.

## II. LEGAL STANDARD

The Freedom of Information Act is premised on the notion that an "informed citizenry" is "vital to the functioning of a democratic society" and "needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The Act embodies a "general philosophy of full agency disclosure." *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976)). It thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions. "These exemptions are 'explicitly made exclusive' and must be 'narrowly construed.'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973), and *FBI v. Abramson*, 456 U.S. 615, 630 (1982)). As explained further below, the present dispute turns on the scope and application of Exemptions 6 and 7(C). Both of those exemptions "seek to protect the privacy of individuals identified in certain agency records." *ACLU I*, 655 F.3d at 6. Exemption 6 extends to "personnel and medical files and similar files," 5 U.S.C. § 552(b)(6), while Exemption 7(C) applies to "records or information compiled for law enforcement purposes," *id.* § 552(b)(7)(C).

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56. *See*, *e.g.*, *Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011). To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In a FOIA action, the agency may meet its burden by submitting "relatively detailed and non-conclusory" affidavits or declarations, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks and citation omitted), and an index of the information withheld,

which is commonly known as a "Vaughn index," *see Vaughn v. Rosen*, 484 F.2d 820, 827–28

(D.C. Cir. 1973).  An agency "is entitled to summary judgment if no material facts are in dispute

and if it demonstrates 'that each document that falls within the class requested either has been

produced . . . or is wholly exempt from the [FOIA's] inspection requirements.'"  *Students*

*Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting *Goland v.*

*CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).  The Court reviews the agency's decision de novo,

and the agency bears the burden of sustaining its action.  5 U.S.C. § 552(a)(4)(B).

### III.  ANALYSIS

The Department withheld the docket numbers at issue pursuant to FOIA Exemptions 6

and 7(C).  Dkt. 1-1 at 26.  Both exemptions protect personal privacy, but they differ in scope.

Exemption 6 shields "personnel and medical files and similar files the disclosure of which would

constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  "[T]he

mere fact that an agency file or record contains personal, identifying information," however, "is

not enough to invoke Exemption 6;" in addition, the information must be "'of such a nature that

its disclosure would constitute a clearly unwarranted privacy invasion.'"  *Judicial Watch, Inc. v.*

*U.S. Dep't of State*, 282 F. Supp. 3d 36, 49–50 (D.D.C. 2017) (quoting *Nat'l Ass'n of Home*

*Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)).  Exemption 7(C), in contrast, applies only

to records or information "compiled for law enforcement purposes," and it offers more robust

protection for those records.  *See Tracy v. U.S. Dep't of Justice*, 191 F. Supp. 3d 83, 95 (D.D.C.

2016).  While Exemption 6 is limited to records "the disclosure of which would constitute a

clearly unwarranted invasion of personal privacy," *id.* § 556(b)(6), "[t]he adverb 'clearly' . . . is

not used in Exemption 7(C)," *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165–66

(2004).  Moreover, while "Exemption 6 refers to disclosures that 'would constitute' an invasion

of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion." *Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 756 (1989).

The Department argues that the docket numbers at issue here were compiled for law enforcement purposes and thus fall within the scope of Exemption 7(C), and that, because Exemption 7(C) imposes a "lower bar for withholding" than Exemption 6, the Court need consider only "whether Exemption 7(C) was properly invoked." Dkt. 13 at 7. As explained below, the Court agrees. *See ACLU I*, 655 F.3d at 6. And, applying Exemption 7(C) and the governing circuit precedent, the Court further concludes that the Department lawfully invoked the exemption with respect to those cases that did not result in convictions but that it improperly invoked the exemption with respect to those cases that did not result in convictions.

## A.      Compiled for Law Enforcement Purposes

"To fall within Exemption 7, documents must first meet a threshold requirement: that the records were 'compiled for law enforcement purposes.'" *Pub. Empls. for Envt'l Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 202–03 (D.C. Cir. 2014) ("*PEER*") (quoting 5 U.S.C. § 552(b)(7)). In considering this issue, "it is not the nature of the agency that controls, but the character of the records withheld." *Elkins v. Fed. Aviation Admin.*, 99 F. Supp. 3d 90, 98 (D.D.C. 2015). Although an agency's law enforcement capacity is not controlling, "it is not immaterial." *Elkins*, 99 F. Supp. 3d at 98. "If the agency's principal function is law enforcement, [courts] are 'more deferential' to the agency's claimed purpose for the particular records." *PEER*, 740 F.3d at 203 (quoting *Tax Analysts v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002)). "If the agency has mixed law enforcement and administrative functions," however, courts "will 'scrutinize with some skepticism the particular purpose claimed.'" *Id.*

(quoting same).  Although the principal function of several components of the Department is undoubtedly law enforcement, *see Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998) (FBI), the Department does not contend that EOUSA is such a component, *cf.* 3 U.S. Attorney's Manual § 1.120 (2018 version) ("EOUSA's responsibilities encompass legal, budgetary, administrative, and personnel services, as well as continuing legal education."), available at https://www.justice.gov/jm/jm-3-1000-organizationprior-approvals.  The U.S. Attorney's Offices, in contrast, devote a substantial—and perhaps predominant—part of their efforts to law enforcement.  For present purposes, the Court need not decide which component is responsible for compiling the LIONS database, however, because even without any deference to the Department's characterization of the database, the Court is convinced that the records at issue—which deal with terrorism investigations and prosecutions—were compiled for law enforcement purposes.

As the Department explains, the LIONS database is generally used to "manage[], control, and monitor[] . . . the prosecution of the criminal cases of the [94 U.S. Attorney's Offices]."  Dkt 25-1 at 3–4 (2d Kornmeier Decl. ¶ 6).  "Not only does the Government use the specific case files in LIONS when investigating and prosecuting [a] specific case, Government prosecutors and criminal chiefs [also] access previous case files and LIONS data when reviewing, investigating and prosecuting future cases[.]"  *Id.*  The docket numbers, in turn, are compiled to "help ensure that law enforcement officers optimally use" the LIONS database.  *Sack*, 823 F.3d at 694 (holding that reports that help law enforcement assess the efficacy of polygraph examinations are "compiled for law enforcement purposes").  The docket numbers are used, for example, to assist prosecutors in "monitor[ing] past and pending events within the court record," and to "search for criminal case information," such as "relevant criminal dates and judicial events." Dkt. 27-1 at 2–

3 (Jolly Decl. ¶ 5).  The docket numbers, moreover, are among the data in LIONS that prosecutors use to "investigat[e] and prosecut[e] future cases," Dkt. 25-1 at 2–3 (2d Kornmeier Decl. ¶ 6), and to understand "law enforcement resource allocations and provide an overview for prosecutors of the aggregate criminal case landscape," Dkt. 27-1 at 3 (Jolly Decl. ¶ 6).

None of Plaintiffs arguments about the inapplicability of Exemption 7 is persuasive. Plaintiffs argue that the docket numbers are not compiled for law enforcement purposes because they "are assigned by a court clerk through a process entirely independent of DOJ."  Dkt. 16 at 7; *see also* Dkt. 26 at 2 (again pressing this argument); Dkt 29 at 1 (same).  That argument misunderstands the meaning of the statutory term "compiled," 5 U.S.C. § 552(b)(7), which includes "the process of gathering . . . records and information that were generated on an earlier occasion for a different purpose."  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 154 (1989).  As a result, the term "cover[s] documents [and information] already collected by the government originally for non-law enforcement purposes."  *Id.* at 153.  It is, accordingly, of no moment that the docket numbers were generated by a clerk for use in a publicly filed criminal action, so long as they were later compiled—or collected—for law enforcement purposes.

Plaintiffs' suggestion that Exemption 7(C) does not apply to the docket numbers because the LIONS database tracks "*both civil and criminal*" cases is equally unavailing.  Dkt. 22 at 9. "The term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal."  *PEER*, 740 F.3d at 203 (internal citations omitted).  The particular docket numbers at issue, moreover, relate to terrorism cases.  Nor are the docket numbers analogous to the records at issue in *Bartko v. United States Department of Justice*, 898 F.3d 51 (D.C. Cir. 2018), on which Plaintiffs rely.  Dkt. 16 at 16.  *Bartko* addressed a request for records concerning an internal agency disciplinary process, 898 F.3d at 65, that rarely resulted in "misconduct referrals" much

less any "enforcement proceeding or civil sanctions that could warrant Exemption 7(C) protection," *id.* at 68. Here, by contrast, the Department has explained that the docket numbers are used to prosecute criminal cases and to assist U.S. Attorney's Offices in deciding how to allocate law enforcement resources. Thus, unlike the records in *Bartko*, there is "more than [an] ephemeral possibilit[y]" that Exemption 7(C) applies. *Id.* at 68.

Finally, Plaintiffs argue that, even if Exemption 7(C) applies to the LIONS database generally, the Department's obligation to disclose any "reasonably segregable portion of a record" requires it to disclose the docket numbers. *See* Dkt. 26 at 2–3 (citing *Inst. Case for Justice v. IRS*, 941 F.3d 567, 574 (D.C. Cir. 2019)). But that contention conflates the threshold question whether the records at issue were "compiled for law enforcement purposes" with the separate question whether an agency may withhold non-exempt records or information that is intertwined with exempt records or information. Unlike the threshold question, the question of segregability arises only after the Court decides whether the records or information at issue falls within a FOIA exemption. *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51 (D.C. Cir. 2018), and *King & Spalding LLP v. U.S. Dep't of Health & Human Servs.*, 330 F. Supp. 3d 477, 500 (D.D.C. 2018), upon which Plaintiffs rely, *see* Dkt. 15 at 7; Dkt. 29 at 2, followed that approach. In those cases, the courts considered whether any portion of the records at issue could reasonably be segregated and disclosed only *after* concluding that the documents were compiled for law enforcement purposes. *See Bartko*, 898 F.3d at 70–71; *King & Spalding LLP*, 330 F. Supp. 3d at 500–01.

For these reasons, the Court concludes that the docket numbers at issue were compiled for a law enforcement purposes.

**B.      Balance of Interests**

The second question posed by Exemption 7(C) is whether disclosure of the docket numbers "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  In resolving that question, the Court "must balance the public interest in disclosure against the [privacy] interest[s] Congress intended the Exemption to protect."  *Reporters Comm. For Freedom of Press*, 489 U.S. at 776.  The parties agree, and the law of the circuit is clear, that the significance of the privacy interest protected by Exemption 7(C) varies depending on whether the underlying case resulted in a conviction: "defendants whose prosecutions ended in acquittal or dismissal have a much stronger privacy interest in controlling information concerning those prosecutions than defendants who were ultimately convicted."  *ACLU II*, 750 F.3d at 933.  In light of this difference, the Court will address each category separately.

1.      *Docket Numbers for Cases that Resulted in Convictions*

a.      Privacy Interest

In *ACLU I*, the D.C. Circuit held that an agency's disclosure of public docket numbers for cases that resulted in convictions implicates a cognizable privacy interest, albeit one "at the lower end of the privacy spectrum."  *ACLU I*, 655 F.3d at 7.  The privacy interest exists because disclosure of the docket information, through "derivative use[]," may reveal information about a defendant's "conviction or public guilty plea," and that information falls within "the scope of Exemption 7(C)."  *Id.* at 8.  But even though the disclosure of public docket numbers "compromise[s] more than a de minimis privacy interest," it does "not compromise much more." 655 F.3d at 12.  Taking that premise as their starting point, Plaintiffs argue that the privacy

interest at stake here "remains where *ACLU I* left it: slightly more than *de minimis*." Dkt. 16 at 21. The Department, in contrast, argues that this case involves a "heightened privacy interest" because the docket numbers pertain to "stigmatic" terrorism prosecutions. Dkt. 13 at 14. The truth lies somewhere between the parties' competing characterizations.

Plaintiffs' contention that *ACLU I* "compels disclosure" of the docket information for all "cases where there was a conviction or guilty plea" overlooks relevant distinctions between *ACLU I* and this case. Dkt. 16 at 7–8. As the Department observes, in *ACLU I* the D.C. Circuit did not discount the "possibility that a FOIA request might be worded in such a way as to generate a list of convictions that, because of particularly stigmatic associations or otherwise, could draw special attention to the names on the list and so create heightened privacy concerns." *Id.* at 11 n.14. The Department argues that this is such a case. In support, it notes that the only commonality among the prosecutions at issue in *ACLU I* was that each prosecution involved the "use of warrantless cell phone tracking." *ACLU I*, 655 F.3d at 11. Here, by contrast, Plaintiffs' FOIA request seeks a list of prosecutions that the Department has categorized as terrorism related. The Court is persuaded that the stigma of a terrorism conviction is likely substantial and that disclosure of the docket numbers of cases that the Department has characterized for its internal purposes as terrorism-related risks inviting unwanted attention on the subjects of those prosecutions. *See Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 876 (D.C. Cir. 1989) ("*NARFE*") ("The extent of any invasion of privacy that release of the list might occasion . . . depends upon the nature of the defining characteristics, *i.e.*, whether it is significant that an individual possesses them.").[1]

---

[1] Considering the Department's internal categorization as part of the subjects' privacy interests raises the question whether the categorization itself gives rise to a cognizable privacy interest for

The problem with the Department's position, however, is similar problem to the problem that it was unable to surmount in *ACLU I*: For those prosecutions that have resulted in convictions, it is unlikely that the case and the government's allegations have previously avoided public attention. To the contrary, even in garden-variety cases, "newspapers regularly report on federal prosecutions, and their accounts can easily be found on the internet." *ACLU I*, 655 F.3d at 10. If anything, terrorism-related cases are likely to generate more press coverage and greater public attention than the average case. As a result, the Department cannot plausibly argue (nor does it attempt to argue) that the public "will hear of" the terror-related nature of the cases "for the first time merely because the Justice Department releases a list of docket numbers." *Id.* As in *ACLU I*, it is "little more than speculation" to suggest that "friends or associates who did not learn of a [terrorism-related] conviction at the time it occurred (whether through press accounts, press releases, or other means) will hear of it for the first time merely because the Justice Department releases a list of docket numbers, courts, and case names." *Id.*

In any event, if the privacy interest at stake here were greater than in *ACLU I*, the interest is still far weaker than the core interests protect by Exemption 7(C). Exemption 7(C) is principally concerned with protecting individuals' "strong interest in not being associated

---

purposes of Exemption 7(C). In the Court's view, it does. In *ACLU I*, the D.C. Circuit drew a distinction between "information that raises issues of personal privacy"—*i.e.*, "the fact that particular individuals have been convicted of or pled guilty to crimes" and information "regarding the government's policy"—which, in that case, concerned the agency's policies with respect to "warrantless cell phone tracking." *ACLU I*, 655 F.3d at 11. That distinction does not map onto the present facts. The Department's categorization of particular offenses as terrorism-related is closely tied to what the criminal defendant did—not just to what the Department did. As a result, disclosure of the docket numbers associated with cases that the Department has characterized as terrorism-related would implicate the criminal defendants' interests in "control[ling] information concerning his or her person." *Reporters Comm.*, 489 U.S. at 763.

*unwarrantedly* with alleged criminal activity." *Stern v. FBI*, 737 F.2d 84, 91–92 (D.C. Cir. 1984) (emphasis added). As a result, the privacy interests of individuals "who were convicted or pled guilty" differs greatly from those who have "not been convicted in connection with [an] investigation—and even more so [from] those who have not been publicly linked with [a criminal] investigation whatsoever." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 854 F.3d 675, 683 (D.C. Cir. 2017); *see also ACLU I*, 655 F.3d at 7 n.8 (collecting cases and noting the distinction). This is not to say that criminal defendants have "*no* privacy interest in the facts of [their] conviction" but only that their "interests are weaker than" the interests of those "who have been acquitted or whose cases have been dismissed." *ACLU I*, 655 F.3d 7. Finally, the nature of the requested information sought weakens the relevant privacy interests even more. As the D.C. Circuit noted in *ACLU I*, docket numbers "contain[] little that is personal," "reveal only a single prosecution," and their disclosure leads "only [to] information that has already been the subject of a public proceeding."[2] *Id.* at 8.

> b.  Public Interest and Balance of Interests

On the other side of the Exemption 7(C) scale, the FOIA requester "bears the burden of showing (1) that 'the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,'" and (2) that "the information [it] seeks 'is likely to advance that interest.'" *Roth*, 642 F.3d at 1174–75 (quoting *Favish*, 541 U.S. at 172). "The public interest that must be weighed is the extent to which disclosure advances the

---

[2]  One can imagine an argument that the Department's characterization of an offense as "terrorism-related" is not information that is already public or that could be easily found by reviewing the public docket. Someone's neighbors, for example, might know that a subject had pleaded guilty to a financial crime of some sort but might not know that, in the Department's view, that crime was connected to domestic or international terrorism. The Department, however, has not made this argument, nor can the Court discern from the limited information that is before it whether this hypothetical harm is fanciful or real.

basic purpose of the [FOIA] to open agency action the light of public scrutiny, . . . thereby furthering the citizens' right to be informed about what their government is up to." *ACLU I*, 655 F.3d at 6 (quoting *Reporters Comm.*, 489 U.S. at 772) (internal quotations omitted). Plaintiffs have carried this burden.

With respect to the first prong of the test, Plaintiffs have shown that the public has a significant interest in understanding the Department's "current strategies and success rates with regard to terrorism-related prosecutions." Dkt. 16 at 24. As a general matter, the topic of "substantive law enforcement policy," such as the Department's prosecution of terrorism cases, is "properly the subject of public concern." *Reporters Comm.*, 489 U.S. at 766 n.18. Terrorism prosecutions—and which cases the Department characterizes as "terrorism" cases—moreover, touch on an array of issues of public attention, ranging from immigration policy, national security, and the allocation of prosecutorial resources. *See, e.g.*, U.S. Dep't of Justice & Fed. Bureau of Investigation, Justice Mgmt. Div., FY 2019 Budget Request By Strategic Goal, available at https://tinyurl.com/tk442qp, last accessed (Feb. 27, 2020) (indicating that the Department expended $5.6 billion dollars to "[c]ounter the [t]hreat of [t]errorism" in FY 2019).

With respect to the second prong of the test, Plaintiffs have also shown that the information they seek would advance the public's interest in knowing how the Department categorizes "terrorism" cases, how it allocates its resources in prosecuting domestic and international terrorism cases, and how the threat of terrorism has evolved in recent years. As Plaintiffs explain, without the docket numbers, they cannot comprehensively analyze the prosecutions that the Department has designated as terrorism-related. Dkt. 16 at 24. Neither the federal judiciary's national docket access system, Public Access to Court Electronic Records ("PACER"), nor any court-specific filing-systems identify cases as "terrorism-related." *See id.*

Although interested members of the public might be able to identify a subset of cases that the Department considers terrorism-related based on the Department's press releases, the only way to conduct a comprehensive study of the prosecutions Department categorizes in this manner is through the disclosure of the requested docket numbers. *See* Dkt. 16-2 at 4–5 (Patel Decl. ¶¶ 12–13). Thus, as in *ACLU I*, the requested information "will yield further information about the government's policy that is not now readily available." 655 F.3d at 15; *see also Steinberg v. Dep't of Justice*, 179 F.R.D. 366, 370 (D.D.C. 1998) (finding that a FOIA request would advance the public's interest by illuminating "what measures the government [has been] willing to initiate in order to combat a perceived threat to its national security").

None of Department's counterarguments is persuasive. The Department first argues that the rule announced in *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991), which provides categorical protection for names of private individuals found in law enforcement files unless necessary to expose that the agency is engaged in illegal activity, applies here. Dkt. 13 at 17. But the D.C. Circuit has recently held that that rule does not extend to "individuals who have already been publicly identified . . . as having been charged, convicted or otherwise implicated" in connection to a law enforcement investigation or prosecution. *Citizens for Responsibility & Ethics in Wash.*, 854 F.3d at 682. The Department's analogy to *Long v. Dep't of Justice*, 450 F. Supp. 2d 42 (D.D.C. 2006), also misses the mark. Dkt. 13 at 19–20. In *Long*, the requesters failed to identify how the requested information would advance any interest in "what the Government is up to" and instead sought the data merely to promote a generalized interest in "scholarly inquiry." 450 F. Supp. 2d at 70. Unlike the requesters in *Long*, Plaintiffs have articulated an "interest more specific than having the information for its own sake." *Favish*, 541 U.S. at 172. Plaintiffs attest that the docket numbers will be used, for example "to understand

what conduct the government categorizes as relating to 'domestic terrorism' and to analyze how [the Department] allocates its counterterrorism resources, in particular with respect to domestic versus international terrorism." Dkt. 16 at 23 (citing Dkt. 16-1 at 2 (Kurzman Decl. ¶ 4)).

The Department's argument that the public interest in the docket information should be "discounted" because there are "alternative sources of public information about how [the Department] prosecutes terrorism" is equally unavailing. Dkt. 13 at 21. "The fact that the public already has some information does not mean that more will not advance the public interest." *ACLU I*, 655 F.3d at 15. This is particularly true when the information the agency makes publicly available may tell only a part of the story, while omitting other potentially relevant information. *See Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1072 (D.C. Cir. 1993) ("FOIA was designed to preclude a government agency from cherry-picking the materials to be made public."). Although the Department already collects and makes publicly available "information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offense," Exec. Order No. 13780, 82 Fed. Reg. at 13217 § 11(a), it does not provide similar data regarding domestic terrorism cases. The information Plaintiffs seek is thus not merely cumulative.

Finally, the Court must balance the privacy interest against the public interest. On the facts of this case, that balance tips decidedly in favor of disclosure. To start, the Court must bear in mind that FOIA was "designed to pierce the veil of administrative secrecy" and thus embodies a "strong presumption in favor of disclosure," which "places the burden on the agency to justify the withholding of any requested documents." *Ray*, 502 U.S. at 173 (internal quotations omitted). Even without that presumption, however, this is not a close case. As explained above, the privacy interest at stake is minimal. To be sure, terrorism charges are uniquely stigmatizing.

But, where someone has been convicted of terrorism-related charges, disclosure of the information contained in the LIONS database—including the docket number of the case—would risk little additional public opprobrium. The charges at issue, the facts of the case, and the resulting conviction are already public, and it is unlikely that release of the docket numbers from the LIONS database will elicit attention or news coverage that intrudes on the defendant's privacy in a new or different manner. On the other hand, the public interest weighs heavily in favor of disclosure. Understanding how and when the Department categorizes cases as terrorism cases and following trends relating to these prosecutions would shed light on the workings of government and "would inform . . . ongoing public policy discussion[s]" on range of issues, *ACLU I*, 655 F.3d at 13, from immigration, to national security, to prosecutorial priorities, *see Reporters Comm.*, 489 U.S. at 766 n.18; *Steinberg v. Dep't of Justice*, 179 F.R.D. 366, 370 (D.D.C. 1998) (finding a "significant" public interest in the disclosure of documents relating to the "criminal investigation of alleged counter-terrorist activities").

Accordingly, "in light of . . . the relative weakness of the privacy interest at stake" and "the strength of the public interest in disclosure," the Court concludes that release of the docket numbers for cases that resulted in convictions "will not constitute an 'unwarranted' invasion of personal privacy under Exemption 7(C)." *ACLU I*, 655 F.3d at 16.

2. *Docket Numbers for Cases That Resulted in Acquittals or Dismissals*

In *ACLU II*, the D.C. Circuit addressed the question left open in *ACLU I*: whether the Department of Justice should have to "disclose docket information for . . . prosecutions in which the defendant had been acquitted or had the charges dismissed." 750 F.3d at 929. It concluded that, even assuming "that the public interest in disclosure [was] equal[] [to] that in *ACLU I*, that interest pale[d] in comparison to the substantial interests in privacy . . . at stake" where the

individuals at issue were charged but not convicted. *Id.* at 935. Although the facts of this case do not precisely parallel those at issue in *ACLU II*, the same logic and the same conclusion applies here.

The Court, again, starts with an assessment of the privacy interest at stake before turning to the countervailing public interest.

a.   <u>Privacy Interest</u>

Relying on *ACLU II*, the Department maintains that the "Court should have no hesitation in concluding" that it properly withheld the docket numbers for the 724 cases that resulted in acquittals or dismissals. Dkt. 19-3 at 18. The D.C. Circuit's analysis in *ACLU II* supports that view. Thus, although recognizing that the privacy interests of those subject to criminal prosecution are less weighty than those subject to criminal investigation, the D.C. Circuit held that "defendants whose prosecutions ended in acquittal or dismissal have a much stronger privacy interest in controlling information concerning those prosecutions than defendants who were ultimately convicted." 750 F.3d at 932–33. As the Court explained: "The presumption of innocence stands as one of the most fundamental principles of our system of criminal justice," and, "[u]nfortunately, public perceptions" do not always hold the government to its burden of proof. *Id.* at 933. Release of docket information for those who were not convicted of a crime, the Court reasoned, risks renewing attention on those subject to these prosecutions, risks interfering with their entitlement "to move on with their lives," and thus risks infringing upon their privacy interests. *Id.* at 933–35.

Although Plaintiffs do not take issue with this reasoning, they argue that *ACLU II* is distinguishable for three reasons and that the privacy interest at stake here is "far weaker than that considered in *ACLU II*." Dkt. 16 at 26. None of their arguments is persuasive.

First, Plaintiffs rely on numerical differences. *ACLU II* concerned six cases of acquittals or dismissals (out of a total 214 total cases), while Plaintiffs' request concerns 724 acquittals or dismissals (out of 4,496 total cases). *See* Dkt. 16 at 27. According to Plaintiffs, the privacy interest at stake is diminished in this case because "each individual would be one name buried in a list 724 long," *id.*, "making the chance for any renewed publicity incrementally less likely," Dkt. 22 at 21. But Plaintiffs cite no authority to support the proposition that privacy interests rachet up or down depending on the number of records requested. That lack of authority is unsurprising. The "extent of any invasion of privacy that release of [a] list might occasion" depends "upon the nature of [its] defining characteristics, *i.e.*, whether it is significant that an individual possesses them." *NAFRE*, 879 F.2d at 873 (upholding an agency's withholding of a list that contained the information of "hundreds of thousands of individuals" because it revealed information that could be used to harass them). Moreover, even if the release of a mass of data might—at least arguably—reduce the risk to each individual, the overall risk of intruding on the significant privacy interests of the group increases with the size of the release. No one would suggest, for example, that a massive data breach resulting in the theft of millions of personal health records is not serious—even if each individual patient might take some (cold) comfort in the hope that their medical records might be lost in the flood of information. The same is true here.

Second, Plaintiffs highlight the Department's practice of issuing press releases that announce the names of individuals in many terrorism-related prosecutions. *See* Dkt. 16 at 27. But that practice, which was also at play in *ACLU II*, is insufficient to defeat the substantial privacy interest of defendants who have been acquitted or whose cases have been dismissed. Despite the existence of those press releases, disclosure of the docket numbers would "create the

risk—perhaps small, but nonetheless real—that renewed attention would be paid to the individuals who were the subject of these prosecutions." *ACLU II*, 750 F.3d at 934 (internal citations omitted). And, "[w]hile this attention would have been warranted at the time of indictment, now that these defendants have been acquitted or had the relevant charges dismissed, they have a significant and justified interest in avoiding additional and unnecessary publicity." *Id.* The question is not whether the Department has once brought public attention to these individuals; the question is whether disclosure would impede the defendants' ability "to move on with their lives without having the public reminded of their alleged but never proven transgressions." *Id.* at 933. For the reasons explained in *ACLU II*, it would.

Third, Plaintiffs disclaim any intent to contact individuals on the list, which they contend sets this case apart from *ACLU II*, where the plaintiff had an "express plan to contact the individuals on the list." Dkt. 16 at 28. That distinction, however, does little to weaken the strength of the defendants' privacy interest. Even taking Plaintiffs at their word that they do not intend to contact the individuals on the list, that is no guarantee that others who would have access to the disclosed information will leave those individuals alone. *NAFRE*, 879 F.2d at 875 (observing that, because information that is disclosed is "available to everyone," it would "be illogical as well as unfair" to balance only "the private interest in avoiding disclosure only to the party making the request, and to ignore the impact on personal privacy of the more general disclosure that will likely ensue"). And, more importantly, in *ACLU II*, the D.C. Circuit concluded that the potential for contact was "relatively minimal" yet still held that "such an intrusion [would] be especially undesirable for individuals who are understandably trying to put their past ensnarement in the criminal justice system behind them." *ACLU II*, 750 F.3d at 935. Again, the same is true here.

b.    Public Interests and Balance of Interests

On the other side of the scale, Plaintiffs argue that the public interest at issue in this case is "far greater" than in *ACLU II* because "this administration has pushed this *specific* data into the spotlight by using it selectively to support its marquee policy proposals." Dkt. 16 at 29. Although the Court does not doubt that the docket numbers could be used to shed light on a topic of substantial public interest, the same was true in *ACLU I* and *ACLU II*. As the D.C. Circuit explained in *ACLU I*, "[t]he use of and justification for warrantless cell phone tracking [was] a topic of considerable public interest." 655 F.3d at 12. The topic had "received widespread media attention and [had] been a focus of inquiry in several congressional hearings," and "[c]ourts were divided as to whether the government must show probable cause before it [could] obtain cell phone location data" or make use of "GPS surveillance." *Id.* at 12–13. Disclosure of the docket numbers for cases that resulted in convictions, the D.C. Circuit explained, "would inform this ongoing public policy discussion by shedding light on the scope and effectiveness of cell phone tracking as a law enforcement tool." *Id.* at 13. In *ACLU II*, the D.C. Circuit assumed that the public interest in disclosure of the docket numbers for cases that resulted in acquittals or dismissals was equal to the public interest in *ACLU I*. 750 F.3d at 935. But, even in the face of that substantial public interest, the D.C. Circuit upheld the Department's decision to withhold the docket numbers for cases that resulted in acquittals or dismissals. *Id.*

Plaintiffs bear the burden of showing that the public interest supports disclosure of "the *specific* information being withheld," *King v. U.S. Dep't of Justice*, 830 F.2d 210, 234 (D.C. Cir. 1987) (internal quotations omitted), but they have offered scant evidence of how disclosure of the docket numbers in this case would shed greater light on the workings of government than in *ACLU II*. To be sure, the public interest inquiry turns, in part, on "the incremental value of the

specific information being withheld," *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2013), and one might argue that the docket numbers at issue in *ACLU II* were of less incremental value than the docket numbers for cases that resulted in acquittals or dismissals at issue here. Indeed, that was the point of Judge Tatel's concurring opinion in *ACLU II*, which explained that "most of the benefit [the Court] anticipated from the release of the requested docket information [in *ACLU I*] flowed from the fact that access to a large sample of prosecutions would provide a basis for the public to discern general trends regarding the government's use of cellphone tracking data and the means by which the government obtains such data." 750 F.3d at 938 (Tatel, J., concurring). Although release of the few remaining docket numbers—for cases that resulted in acquittals or dismissals—might have revealed "some interesting anecdotal evidence," there was "little to suggest that these [additional] cases" would have allowed insights not gleaned from the docket numbers already released. *Id.* at 939.

According to Plaintiffs, the same cannot be said of this case, where information relating to the cases that resulted in acquittals or dismissals could prove "particularly relevant to [their] analysis of bias in terrorism-related prosecutions." Dkt. 16-2 at 4 (Patel Decl. ¶ 11). That may be right. But it does not change the bottom line because the *ACLU II* majority opinion, which Judge Tatel also authored, held that the docket numbers were not subject disclosure, even if the public interest in disclosure of the remaining docket numbers was equal to the public interest in disclosing the initial tranche. *Id.* at 935. To be clear, *ACLU II*, did not hold that the disclosure of docket numbers for cases that resulted in acquittals or dismissals is never warranted but, rather, only that the privacy interests at stake are more substantial than for cases that ended in conviction. Here, that distinction is dispositive because Plaintiffs have offered no basis for the

Court to find that the public interest in disclosure of the docket numbers is greater than the public interest the D.C. Circuit considered in *ACLU I* and *ACLU II*.

Finally, Plaintiffs' reliance on numerical distinctions is, once again, misplaced. Plaintiffs argue that the public interest is greater here than in *ACLU II* because the request there sought only six cases while "Plaintiffs here seek data for 724 cases." Dkt. 29 at 40. But that is difference without distinction. The Court in *ACLU II* assumed that the "public interest in disclosure" was equal to that in *ACLU I*, and it still found that the public interest "pale[d] in comparison to the substantial" privacy interests at stake. 750 F.3d at 935. In other words, the number of records was not dispositive in *ACLU II*, and, for similar reasons, it is not dispositive here.

Accordingly, the Court concludes that the Department may lawfully withhold the docket numbers for cases that resulted in acquittal or dismissal under FOIA Exemption 7(C).

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** in part and will **DENY** in part Defendant's motion for summary judgment, Dkt. 13, and will **GRANT** in part and will **DENY** in part Plaintiffs' cross-motion for summary judgment, Dkt. 16.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: March 12, 2020